UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 3:02-CR-116 JD

EDWARD JOHNSON

## OPINION AND ORDER

In 2002, Defendant Edward Johnson and four others tried to rob First State Bank of Porter in the Town of Pines, Indiana. One of his codefendants, Odell Corley, went inside and shot and killed in cold blood two of the bank's tellers and seriously injured a guard. Following the shooting, Mr. Johnson entered, removed the guard's firearm, and kept watch. As it turned out, the safe was locked, so the two men ran out empty handed where a getaway car and driver were waiting.

Mr. Johnson was apprehended and eventually pleaded guilty to two counts of aggravated bank robbery that resulted in death. (Plea Agreement, DE 259 at 3.) On January 14, 2005, the late United States District Judge Rudy Lozano sentenced him to two concurrent 40-year sentences. (DE 757.)

With just over 12 years left to his sentence, Mr. Johnson moved (for the second time) for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). For the reasons below, the Court will deny the motion.

### A. Background

In July 2002, Mr. Johnson and four others conspired to rob the First State Bank of Porter in the Town of Pines. (PSR, DE 994 ¶ 12.) The plan called for Mr. Johnson, Odell Corley, and

Andre McGregor to drive to the bank and enter while disguised and armed. (*Id*. ¶ 13.) Two other co-conspirators (Jeana Ramsey and Danyass Gay) were to wait at other locations and assist in the getaway. (*Id*.)

On August 27, 2002, Messrs. Johnson, Corley, and McGregor drove to the bank. (*Id*. ¶ 17.) Mr. Corley entered the bank alone and immediately shot the security guard and two bank tellers.[1] Mr. Johnson entered next and retrieved the security guard's firearm while Mr. Corley tried to gain access to the safe. (*Id*. ¶ 19–20.) The safe was locked so the two men fled with Mr. McGregor who was on lookout outside and in charge of driving the getaway car. They met up with Ms. Ramsey, switched the cars, and set the getaway car on fire. The four of them then met up with Ms. Gay and the group split up to continue their escape.

In November 2002, a Federal Grand Jury returned a 10 Count Superseding Indictment against Mr. Johnson and his codefendants. The Superseding Indictment charged Mr. Johnson in eight counts:

- Count 1, conspiracy to commit bank robbery (18 U.S.C. §371);

- Count 2, aggravated bank robbery (18 U.S.C. §2113(d));

- Count 3, killing Kay Peckat during an aggravated attempted bank robbery (18 U.S.C. § 2113(e));

- Count 4, possession of a firearm during a crime of violence (18 U.S.C. §924(c));

- Count 5, causing death by use of a firearm (18 U.S.C. §924(c) & 9240)(1));

- Count 7, felon in possession of a firearm (18 U.S.C. §922(g) & 924(a)(2));

---

[1] As a result of the shooting, the security guard, Keith Hill, suffered permanent paralysis. One of the tellers, Kay Peckat died on the scene. The other teller, Chandler Simpson, was shot in the head and died at a later date.

- Count 9, killing Chandler Simpson during an aggravated attempted bank robbery (18 U.S.C. § 2113(e)); and

- Count 10, Causing Death by Use of a Firearm (18 U.S.C. §924(c) & 924(j)(1)).

(Superseding Indictment, DE 69.)

A year later, in November 2003, Mr. Johnson entered into a plea agreement with the Government and pleaded guilty to Counts 3 and 9, charging him with the killings of the two tellers during an aggravated attempted bank robbery. (PSR, DE 994 ¶ 6–7.) In his plea agreement, Mr. Johnson admitted to his involvement in the attempted robbery:

> . . . on or about August 27, 2002, I took part in the armed robbery of the First State Bank of Porter . . . .
>
> On August 27, 2002, Odell Corley, Andre McGregor and I agreed to rob the bank using various firearms. Jeana Ramsey and Danyass Gay agreed to drive two cars which would be used as "getaway cars" immediately following the robbery. Neither Ramsey nor Gay were at the bank itself during the actual robbery.
>
> On or about August 27, 2002, we first instructed Danyass Gay to drive to a service station parking lot in Michigan City, Indiana and wait for us. Corley, McGregor, Jeana Ramsey and I then drove in Ramsey's blue Cadillac to Michigan City and picked up another vehicle, being a Dodge. We then drove to a secluded drive in the Michigan City area and instructed Ramsey to wait for us while Corley, McGregor and I, armed with firearms, robbed the bank.
>
> McGregor drove the Dodge to the bank with Corley and I as passengers. Corley was carrying a semiautomatic handgun; I was in possession of a revolver, and McGregor had a sawed-off shotgun. All three weapons were loaded and fully functional. While McGregor waited in the Dodge, Corley went inside the bank first, carrying his handgun. I was still outside when I heard several gunshots. Corley then came out of the bank and got me. I then went inside and saw a security guard lying on the floor having been shot by Corley. I removed the guard's service revolver from its holster and placed it on the counter inside the bank. Corley ran out from the vault area and yelled that the vault was locked. Corley and I both fled the bank and got into the Dodge with McGregor.
>
> McGregor drove the Dodge to the secluded drive where Ramsey waited. Corley and I took off items of clothing we wore as disguises and burned the Dodge. Corley, McGregor and I got into the Cadillac with Ramsey, and we drove to the service station area where Gay waited. As we drove past, Gay fell in behind and followed

us to an apartment complex in Michigan City. Corley and McGregor got into Gay's car and they left. Ramsey and I drove away in the Cadillac and returned to Rochester, Indiana.

(Plea Agreement, DE 259 ¶ 9(b).)

Even before the instant offense, Mr. Johnson had a serious and lengthy criminal history which included juvenile convictions for burglary and aggravated battery, as well as adult convictions for multiple robberies, burglary, criminal recklessness, battery, receiving stolen property, and illegally carrying a handgun, (PSR, DE 994 ¶¶ 66–82.)

Pursuant to the plea agreement and under § 2113(e), Mr. Johnson's statutory maximum term of imprisonment was life. (*Id*. ¶¶ 109, 110); § 2113(e) (if death results during the commission of any offense defined in this section, the offender shall be punished by death or life imprisonment). His total offense level was 45, and his criminal history category was V, resulting in a Guidelines range of life imprisonment. (PSR, DE 994 ¶ 111). The Government filed a substantial assistance motion, which Judge Lozano granted and sentenced Mr. Johnson to concurrent 40-year terms of imprisonment on each count. (DE 756).

Except for Mr. Corley, who was tried by a jury, all of Mr. Johnson's codefendants pleaded guilty. As with Mr. Johnson, the Government moved for reduction of sentence for substantial assistance on behalf of Mr. McGregor and Ms. Ramsey. The codefendants received the following sentences:

- Mr. Corley: death sentence (DE 737);

- Mr. McGregor: 240 months of imprisonment (DE 761);

- Ms. Ramsey: 85 months of imprisonment (DE 15 in Case No. 2:03-cr-87);

- Ms. Gay: 45 months of imprisonment (DE 777).

After his sentencing, Mr. Johnson filed an appeal, but the Seventh Circuit dismissed it, finding that he was bound by the appeal waiver in his plea agreement and any argument to the contrary was frivolous. *United States v. Johnson*, 139 Fed. Appx. 755, 756 (7th Cir. 2005).

In 2016, Mr. Johnson moved to vacate his sentence under 28 U.S.C. § 2255. (DE 958.) He argued that his sentence was enhanced under the residual clause of the Armed Career Criminal Act, which the Supreme Court held in *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015), to be unconstitutionally vague. This Court found *Johnson* had no bearing on this case because Mr. Johnson was not sentenced under the Armed Career Criminal Act and 18 U.S.C. § 2113(e) does not contain any sort of residual clause that is comparable to the Armed Career Criminal Act. Nor was he classified as a career offender under the residual clause of U.S.S.G. § 4B1.1. Instead, the PSR used the Petitioner's prior convictions to calculate his criminal history score under U.S.S.G. § 4A1.1(a). Accordingly, the Court dismissed Mr. Johnson's petition. (Op. & Order, DE 992.) Mr. Johnson did not appeal the judgment.

In October 2021, Mr. Johnson moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on the threat of the COVID-19 virus (Def.'s First Mot., DE 1020.) He argued that he was suffering from severe obesity, hypertension, high cholesterol, and being a cigarette smoker for over 10 years prior to his incarceration, all of which he believed made him more susceptible to harm from the COVID-19 virus. (DE 1020 at 6.) The Court denied the motion finding that Mr. Johnson provided no medical records to support his claims. In addition, the Court found that the availability of Covid-19 vaccines mitigated the risks that Mr. Johnson complained of, which undermined his claim that there were "extraordinary or compelling" reasons justifying a sentence reduction. (Op. & Order, DE 1036.) The Court also ruled that, even if Mr. Johnson's claims constituted extraordinary and compelling reasons for relief, the Court

would still deny his motion on the basis of the § 3553(a) factors. (*Id.* at 5–6.) In particular, the Court noted the serious nature of the circumstances of the crime and Mr. Johnson's long criminal history. *Id.*

Mr. Johnson was 29 when he committed the crimes. He is now 52 years old. He is incarcerated at Yazoo City Medium FCI with a release date of February 10, 2037. *See* Federal Bureau of Prisons Inmate Locator, https://www.bop.gov/inmateloc/ (last visited October 4, 2024).

### B. Standard of Review

A court generally cannot modify a sentence once the sentence has been imposed. 18 U.S.C. § 3582(c). However, as relevant here, an exception to that general rule allows a court to modify a sentence, after considering the factors under § 3553(a), if "extraordinary and compelling reasons warrant such a reduction," the reduction is consistent with policy statements issued by the Sentencing Commission, and the defendant has submitted such a request to the warden at least 30 days before filing a motion or has fully exhausted all administrative rights within the BOP. 18 U.S.C. § 3582(c)(1)(A).

The analysis on compassionate release proceeds in two steps. *United States v. Thacker*, 4 F.4th 569, 576 (7th Cir. 2021). At the first step the defendant must identify an extraordinary and compelling reason warranting a sentence reduction. *Id.* If the defendant establishes such a reason, the district court, in the discretion conferred by the statute, considers any applicable § 3553(a) factors as part of determining what, if any, reduction to award the defendant. *Id.* The movant bears the burden of making such a showing, and the Court has discretion to determine whether

the defendant satisfied that burden. *United States v. Curren*, 2023 U.S. Dist. LEXIS 90170, *5

(S.D. Ill. May 23, 2023) (citing *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021)).

The policy statements to the Sentencing Guidelines offer circumstances, or their

combination, for the existence of extraordinary and compelling reasons:

(1) Medical Circumstances of the Defendant.—

(A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(B) The defendant is—

(i) suffering from a serious physical or medical condition,

(ii) suffering from a serious functional or cognitive impairment, or

(iii) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1).

Other circumstances include an outbreak of an infectious disease at the prison where the

defendant is housed and the defendant is at an increased risk of suffering severe medical

complications or death as a result; advanced age of the defendant when he has served a

significant period of his sentence; family circumstances of the defendant, such as the death or

incapacitation of the caregiver of the defendant's minor children, incapacitation of the

defendant's spouse or parent, where the defendant would be the only available caregiver; or the

defendant was a victim of sexual or physical abuse while in custody. U.S.S.G. § 1B1.13(b)(2)–

(4).

The examples also include "other reasons," that is, where "[t]he defendant presents any

other circumstance or combination of circumstances that, when considered by themselves or

together with any of the reasons" just listed, are similar in gravity to those circumstances. §

1B1.13(b)(5).

Finally, subsection (b)(6) provides that an unusually long sentence may be considered an

extraordinary and compelling reason for an early release:

> If a defendant received an unusually long sentence and has served at least 10 years
> of the term of imprisonment, a change in the law (other than an amendment to the
> Guidelines Manual that has not been made retroactive) may be considered in
> determining whether the defendant presents an extraordinary and compelling
> reason, but only where such change would produce a gross disparity between the
> sentence being served and the sentence likely to be imposed at the time the motion
> is filed, and after full consideration of the defendant's individualized
> circumstances.

§ 1B1.13(b)(6).

The defendant's rehabilitation is not, by itself, an extraordinary and compelling reason:

> Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an
> extraordinary and compelling reason for purposes of this policy statement.
> However, rehabilitation of the defendant while serving the sentence may be
> considered in combination with other circumstances in determining whether and to
> what extent a reduction in the defendant's term of imprisonment is warranted.

§ 1B1.13(d).

### C. Discussion

### (1) *Request for Appointment of Counsel*

In his motion for compassionate release, Mr. Johnson requests appointment of counsel to assist him with the motion. An inmate seeking relief under § 3582 has no constitutional or statutory right to counsel. *United States v. Blake*, 986 F.3d 756 (7th Cir. 2021). As such, Mr. Johnson is not entitled to have counsel appointed. *Blake* nonetheless indicates that a court may, in its discretion, recruit pro bono counsel for an inmate seeking § 3582 relief. *Id*. However, the Court finds there has been no showing in this case that such a step is merited.

Before deciding whether to appoint pro bono counsel, "the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (quoting Pruitt v. Mote, 503 F.3d 647, 654 (7th Cir. 2007)).

Here, apart from stating that he's requesting an appointment of counsel, Mr. Johnson has provided nothing to suggest that he tried to secure counsel on his own. This is a threshold requirement, without which no further inquiry is necessary. *See id.* ("[The first step] is a mandatory, threshold inquiry that must be determined before moving to the second inquiry.") Nevertheless, the Court notes that Mr. Johnson appears to be competent to represent himself: he filed multiple briefs, he cites to authorities, and he appears to have a good grasp of what he's attempting to achieve. Accordingly, Mr. Johnson has not demonstrated that a pro bono counsel is necessary, and his request must be denied.

### (2) *Mr. Johnson's Instant Motion for Compassionate Release*

On April 12, 2023, Mr. Johnson submitted a request for compassionate release to the Warden of the facility where he's incarcerated. He stated that he was a "a key candidate for

Compassionate Release due to the amount of time served, [his] conduct in prison, [his] rehabilitative efforts, and [his] work ethics." (DE 1066-1 at 2.) On June 5, 2023, the Warden denied his request and advised that he could "commence an appeal of this decision via the Administrative Remedy Process by submitting [his] concern on the appropriate form (BP-9) within 20 days of receipt of this response." (Warden's Memo., DE 1066-1 at 3.)

There's no indication that Mr. Johnson filed an administrative appeal. Instead, on July 10, 2023, he moved for compassionate release in this Court. In his motion, he anticipates the November 1, 2023, amendments to U.S.S.G. § 1.B1.13 and, in particular, the addition of subsection (b)(6) which offers relief for unusually long sentences where certain conditions are met. He argues that he's entitled to be released from prison due to "a change in the law" that would affect his sentence if he were sentenced today. Namely, Mr. Johnson claims that an increase in his adjusted offense level from level 33 to level 43, based on victims being killed during the bank robbery, was impermissible without a separate jury finding. He submits that he did not plead guilty to murder under 18 U.S.C. § 1111, and he was outside when the murders took place, so no jury could find him guilty of murder. Yet Judge Lozano sentenced him as if he were responsible for the killings. Mr. Johnson insists that this violates *Alleyne v. United States*, 570 U.S. 99 (2013), which held that any fact that increases the mandatory minimum sentence is an element of a criminal offense that must be admitted or found by a jury beyond reasonable doubt; and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), (the precursor to *Alleyne*) which held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. (*See* Def.'s Br., DE 1066 at 11–13.)

In addition, Mr. Johnson claims that sentencing disparity between himself and his codefendants, as well as other federal defendants convicted of bank robbery, constitutes grounds for compassionate release.

He also argues that he should be released under § 1B1.13(b)(3)(C) because "his mother suffers with severe lupus, asthma, and has survived one open-heart surgery." (Def.'s Br., DE 1066 at 20.) She is 70 years old "and highly anticipates her son's release and return home and assist in her daily needs as she goes through these critical health issues." (*Id*.)

Finally, Mr. Johnson submits that he has "an extraordinary record of rehabilitation" which "includes a sterling clean and clear prison conduct of over 21+ years," which he believes warrants his release. (Def.'s Br., DE 1066 at 14.)

The Government objects to Mr. Johnson's motion for compassionate release. It first argues that he has not exhausted the administrative remedies at the BOP before filing the motion with this Court. But in any case, the Government submits that the motion should be denied because there's no change in applicable law and no sentencing disparity. Finally, the Government contends that the § 3553(a) factors weigh heavily against Mr. Johnson's release.

In his reply brief submitted on September 27, 2024 (DE 1086), Mr. Johnson added three new grounds for relief: by imposing two sentences on Counts 3 and 9 instead of one, Judge Lozano violated the Double Jeopardy clause of the Fifth Amendment; his attorney provided ineffective assistance of counsel; and § 2113(e) is not a crime of violence.

### (3) *Exhaustion of Administrative Remedies*

As it must when such a defense is raised by the Government, the Court starts with the question of exhaustion.

On April 12, 2023, Mr. Johnson submitted a request for compassionate release to the Warden of the Federal Correctional Complex in Yazoo City, Mississippi, where he's incarcerated. (DE 1066-1 at 2.) He stated that he was a "a key candidate for Compassionate Release due to the amount of time served, [his] conduct in prison, [his] rehabilitative efforts, and [his] work ethics." (DE 1066-1 at 2.) The Warden responded 54 days later, on June 5, 2023. (*Id.* at 3.) The Warden's response states that Mr. Johnson is ineligible for compassionate release and advises that he can appeal the Warden's determination via the Administrative Remedy Process. There's no evidence in the record that Mr. Johnson followed that route; instead, he filed the instant motion with the Court on July 10, 2023. As a result, the Government argues that his motion should be dismissed for failure to exhaust administrative remedies.

The Court disagrees with the Government and finds no fault in Mr. Johnson's choice to file his motion before this Court rather than appeal the denial with the BOP. Before a defendant's motion is adjudicated under § 3582(c)(1)(A), he "must first present his request for compassionate release to the warden and exhaust administrative appeals (if the request is denied) or wait '30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.'" *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021); *see also* § 3582(c)(1)(A). Here, Mr. Johnson filed his petition with the Warden on April 12, 2023, and then filed the motion with this Court after "the lapse of 30 days from the receipt of such a request by the Warden."[2] § 3582(c)(1)(A). While the Warden responded to the petition before Mr. Johnson filed the motion with this Court, that changes nothing: § 3582(c)(1(A) does not have a mechanism to reset the clock, so the Warden's belated response has no legal significance for the purpose of exhaustion.

---

[2] As noted, the Warden waited 54 days to respond to Mr. Johnson's petition.

Still, to properly exhaust, "an inmate is required to present the same or similar ground for compassionate release in a request to the Bureau as in his motion to the court." *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021). "The exhaustion requirement is designed to allow the Bureau to bring 'a motion on the defendant's behalf,' before he moves on his own behalf. § 3582(c)(1)(A). And the Bureau cannot determine whether it should bring a compassionate-release motion if an inmate does not explain in his request the ground justifying his release." *Id.* In his petition to the Warden, Mr. Johnson states only that he's a candidate for Compassionate release because of the amount of time served and his conduct in prison, rehabilitative efforts, and work ethic. Even if read liberally, the petition does not touch on several of the issues he's raised here, namely, the application of § 1B1.13(b)(6), the alleged sentencing disparities, and the need to care for his ailing mother. Even so, the Government has not objected on the grounds of "issue exhaustion," so the Court will not limit the scope of Mr. Johnson's motion. *See United States v. Gunn*, 980 F.3d 1178, 1179 (7th Cir. 2020) ("Failure to exhaust administrative remedies is an affirmative defense, not a jurisdictional issue that the court must reach even if the litigants elect not to raise it." (citations omitted)); *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021) (the exhaustion requirement is not jurisdictional and can be waived by the government).

### (3) *Mr. Johnson has Failed to Show that He's Entitled to Compassionate Release*

(a) *§ 1B1.13(b)(6): Change in the Law*

For his first argument, Mr. Johnson claims that extraordinary and compelling reasons exist for his release because of a change in the law that would affect his punishment if he were sentenced today. In particular, he invokes *Apprendi* and *Alleyne*. But *Apprendi* was decided in 2000, two years before the charged offenses and five years before Mr. Johnson was sentenced.

So *Apprendi* constitutes no change in the law for Mr. Johnson. Nor did Judge Lozano violate *Apprendi* when he adjusted Mr. Johnson's offense level from 33 to 43 levels under the Guidelines because of two persons being killed during the bank robbery. This adjustment did not increase Mr. Johnson's statutory penalty under § 2113(e), which was life to begin with. "[W]hen the statutory maximum is life imprisonment, *Apprendi* is beside the point." *Talbott v. Indiana*, 226 F.3d 866, 869 (7th Cir. 2000); *see also United States v. Johnson*, 335 F.3d 589, 591–592 (7th Cir. 2003) ("[F]acts affecting sentencing determinations need not be determined by a jury as long as the sentence imposed does not exceed the maximum penalty set forth in the statute.").

Nor is there a basis for compassionate release under *Alleyne*. Mr. Johnson filed his motion after the implementation of the First Step Act but before the effective date of § 1B1.13(b)(6). During this interim period, the Seventh Circuit held in a series of decisions that neither nonretroactive statutory changes nor nonretroactive changes in case law can constitute extraordinary and compelling reasons for an inmate's early release. *See United States v. Thacker*, 4 F.4th 569, 575 (7th Cir. 2021) ("[T]he discretionary sentencing reduction authority conferred by § 3582(c)(1)(A) does not permit—without a district court finding some independent 'extraordinary or compelling' reason—the reduction of sentences lawfully imposed before the effective date of the First Step Act's amendment to § 924(c)."); *United States v. Williams*, 65 F.4th 343, 346 (7th Cir. 2023) ("We held in [*United States v. Brock*, 39 F.4th 462 (7th Cir. 2022), and *United States v. King*, 40 F.4th 594 (7th Cir. 2022)] that judges must not rely on non-retroactive statutory changes or new judicial decisions when deciding whether an inmate has shown extraordinary and compelling reasons for relief.") And since *Alleyne* is not retroactive, *see Simpson v. United States*, 721 F.3d 875, 876 (7th Cir. 2013) (holding that *Alleyne* was not made retroactive), it's of no help to Mr. Johnson.

14

But even if the court considers Mr. Johnson's argument regarding *Alleyne* in the context of § 1B1.13(b)(6), he still cannot prevail.[3] *Alleyne* held that any fact that increases the mandatory minimum sentence is an element of a criminal offense that must be admitted or found by a jury beyond reasonable doubt. And here, assuming *Alleyne* even applies, Mr. Johnson admitted under oath at the change-of-plea hearing that he understood the elements of § 2113(e), that the two victims were killed during the bank robbery, and that he aided and abetted in their killing:

> Judge Lozano: Now, Mr. Johnson, I want to inform you of the charges to which you're entering a plea of guilty. Do you understand that Counts 3 and 9 of the Superseding Indictment charge you with the crimes of murder during a bank robbery?
>
> A. Yes.
>
> Judge Lozano: Do you further understand that the essential elements during those offenses, in other words, what the government would have to prove at trial beyond a reasonable doubt are: With regard to Count 3, first, that you killed Kay Peckat; And second, that you performed that act during the course of committing the offense of aggravated bank robbery, as defined in Title 18, United States Code, Section 2113(d); And third, that on or about August 27th, 2002, the First State Bank of Porter had its deposits insured by the Federal Deposit Insurance Corporation.
>
> With regards to Count 9: First, that you killed Chandler Simpson; second, that you performed that act during the course of committing the offense of aggravated bank robbery, as defined in Title 18, United States Code, Section 2113(d); and third, that on or about August 27th of the year 2002, the First State Bank of Porter had its

---

[3] As noted already, in *Thacker*, 4 F.4th 569, the Seventh Circuit held that the discretionary sentencing reduction authority conferred by 18 U.S.C.S. § 3582(c)(1)(A) did not permit, without a district court finding some independent extraordinary or compelling reason, the reduction of sentences lawfully imposed before the effective date of the First Step Act's amendment to § 924(c). Since then, the district courts have split whether the Seventh Circuit is likely to find that the Sentencing Commission exceeded its authority in issuing § 1B1.13(b)(6). *See United States v. Buggs*, 2024 U.S. Dist. Lexis 85855 (N.D. Ind. May 13, 2024) (finding that "§ 1B1.13(b)(6) does not serve as a basis for compassionate release and discussing the circuit split as seen in *United States v. Black*, No. 05-CR-70-4, 2024 WL 449940 (N.D. Ill. Feb 6, 2024), and *United States v. Spradley*, No. 1:98-CR-38, 2024 WL 1702873 (S.D. Ind. April 18, 2024)). The Court here, however, need not enter the debate because, regardless of whether subsection (b)(6) is controlling, *Alleyne* is of no consequence to Mr. Johnson.

The Court will address Mr. Johnson's arguments under the latest amendments to § 1B1.13, even though his motion was filed before their effective date, to avoid the waste of resources. After all, unless those arguments are addressed on the merits, Mr. Johnson is likely to refile his motion. Moreover, a substantial part of the briefing took place after November 1, 2023.

deposits insured by the Federal Deposit Insurance Corporation. Do you understand that?

A. No, I don't understand. Are you saying that I killed somebody?

Judge Lozano: Well, I'm saying that's what the government has to prove.

A. Oh, okay.

Judge Lozano: Okay?

A. All right.

Judge Lozano: Now, listen to the next thing I'm going to tell you. Mr. Johnson, the Superseding Indictment also charges you with a violation of Title 18, United States Code, Section 2. Any person who aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of that crime. In order for you, Mr. Johnson, to be found guilty of aiding and abetting the crimes charged in Counts 3 and 9, as a violation of Title 18, United States Code, Section 2113(e), the government would have to prove that you knowingly associated yourself with that criminal—with those criminal ventures, participated in them, and tried to make them succeed. Do you understand that?

A. Yes.

Judge Lozano: Now, do you understand the charges to which you're entering a plea of guilty?

A. Yes, I do.

Judge Lozano: And do you understand that even though you might not have personally killed a person, if you aided and abetted in the commission of a crime, you can be held as a principle?

A. Yes, I understand that.

Judge Lozano: Any questions about that?

A. No, sir.

Judge Lozano: Do you want to talk to your attorney about it?

A. No, sir.

Judge Lozano: I think I asked you this already, but I'll ask it again. Now do you understand each charge to which you're entering a plea of guilty?

A.  Yes.

. . .

Judge Lozano: I'm going to ask you again what occurred. Do you wish to repeat all of the things you said earlier and incorporate them in your statement of fact at this time?

A. Yes, I would you like, yes.

Judge Lozano: Well, I'm asking you. Or do you want to go through all of that again?

A. No. No, sir.

Judge Lozano: You acknowledge and you wish to incorporate all of that as part of your statement of facts?

A. Yes, I do.

Judge Lozano: And do you also acknowledge that during this bank robbery Kay Peckat and Chandler Simpson were killed?

A. Yes.

Judge Lozano: And they were killed by some of the individuals that were involved in the bank robbery with you?

A. Yes.

Q. Do you acknowledge that during this bank robbery you were involved in it?

A. Yes.

Judge Lozano: And that you participated in it?

A. Yes.

Judge Lozano: And that you tried to make it succeed? You wanted the bank robbery to succeed, did you not?

A. Yes, I did.

Judge Lozano: And I think you told me earlier, Mr. Johnson, that the First State Bank of Porter had its deposits insured by the Federal Deposit Insurance Corporation, is that correct?

A. Yes.

Q. And I think you also told me earlier that the First State Bank of Porter is located in the Northern District of Indiana?

A. Yes.

Judge Lozano: And this all occurred on what date?

A. August 27th, 2002.

Judge Lozano: And these two deaths occurred during the course of committing the offense of aggravated bank robbery?

A. Yes.

Q. And this bank robbery occurred with the use of loaded guns, is that correct?

A. True. Yes sir.

Judge Lozano: Everything that you told me earlier, you stand by that?

A. Yes, I do.

Judge Lozano: And anything else you wish to add?

A. No, sir.

(Change of Plea Hrg., DE 277 at 65–69.) In short, having admitted that the victims were killed during the bank robbery and that he aided and abetted in their killing, Mr. Johnson cannot rely on *Alleyne*. He has not shown, nor can he, that, if he were sentenced today, his sentence would be grossly disparate from the sentence imposed by Judge Lozano due to a change in the law. Accordingly, subsection (b)(6) is of no help to him. The statutory sentencing penalty is still the same and the Guideline calculation remains unchanged.[4]

---

[4] As explained below, Mr. Johnson argues in his reply brief that he should have received a single sentence on both counts of conviction. (*See infra* at 25.) But even if that were the case, and if multiple-count adjustment under § 3D1.4 were inapplicable, his Guidelines range would be the same. True, without multiple-count adjustment his adjusted offense level would be 46 instead of 48 as calculated in the PSR (*see* PSR, DE 994 ¶¶ 56–60), which would result in the total offense level of 43 after subtractions under § 3E1.1(a) & (b). But at offense level 43 and criminal history category V, Mr. Johnson's Guidelines range would still be life. *See* U.S.S.G. Sentencing Table.

(b) *§ 1B1.13(b)(3)(C):  Incapacitation of the Parent*

Section 1B.1.13(b)(3)(C) provides that extraordinary and compelling reasons exist when the defendant's parent is incapacitated and "the defendant would be the only available caregiver for the parent." "'Incapacitation' within the meaning of § 1B1.13(b)(3) typically means that the individual is 'completely disabled' and 'cannot carry on any self-care' or 'is totally confined to a bed or chair.' Proving incapacity is a high bar." *United States v. Gross*, No. 1:17-CR-37-HAB, 2024 WL 4100325, at *3 (N.D. Ind. Sept. 5, 2024) (quoting *United States v. Steele*, 2024 WL 1928945, at *3 (S.D. Ohio May 1, 2024)).

Mr. Johnson claims that subsection (b)(3)(C) applies to him because his mother, who is 70 years-old, is suffering from "severe lupus, asthma, and has survived one open-heart surgery." (Def.'s Br., DE 1066 at 20.) But Mr. Johnson submitted no evidence that his mother is incapacitated. Although he provides some of her medical records (all of them from two to three years ago), many are lab reports that, without more, give no insight about his mother's wellbeing. (DE 1083.) Some records are office visit notes, such as regarding a complaint for arm pain after vaccination, or a telehealth visit after the mother got "confused which dose of losartan she's supposed to take" (*Id*. at 7), but the notes appear to be unremarkable. There's one visit summary that does set out the mother's multiple health problems (for example, presence of a tumor, shoulder pain, memory loss, aphasia, disorder of the eyes, headaches, back pain, asthma, hair loss, abnormal electrocardiogram, sleep apnea, diabetes) (*Id.* at 4), but it's impossible to tell from the records whether she's receiving treatment and if they are effective. What is missing is a doctor's attestation that Mr. Johnson's mother is incapacitated. *See United States v. Villar*, No. 16 CR 340, 2024 WL 2939018, at *4 (N.D. Ill. June 11, 2024), at *4 (finding insufficient

evidence in the record that the defendant's parent was incapacitated because doctors failed to opine about the parent's limitations), or something akin to that.

What is more, Mr. Johnson included a letter from his mother but the letter states nothing about her being incapacitated. Instead, she writes mostly about Mr. Johnson being rehabilitated and his wife and children needing him. She mentions that she is getting older and is suffering from COPD and asthma and that she needs her rescue inhaler more often, but she does not indicate that she is incapacitated and without anyone to care for her. In finding that Mr. Johnson has failed to show that his mother is incapacitated, the Court is not suggesting that she is not suffering from serious health ailments or that she's getting along "just fine." To the contrary, it appears that her situation is difficult, and she has gone through a lot. Still, that's different from the legal requirement for showing incapacitation.

In addition, although Mr. Johnson is his mother's only living child, he has not established that he would be the only available caregiver. He states that he is "the only person that my parent will rely upon without fuss or problems of health concerns," which would free up others from having to take "rotational jobs to care for [her]" (Def.'s Suppl. Br., DE 1), but he does not suggest that without him, there's no one else available. Without such a showing, he cannot prevail under subsection (b)(3)(C). *See United States v. Gross*, No. 1:17-CR-37-HAB, 2024 WL 4100325, at *3 (N.D. Ind. Sept. 5, 2024) ("Critical to § 1B1.13(b)(3)(C) is the requirement that the defendant be the sole available caregiver for his incapacitated parent.").
Besides his mother's letter, he submitted letters from his wife and his children, but they mention his mother only in passing and are almost exclusively focused on their own need to have Mr. Johnson back. Mr. Johnson bears the burden to show that he is the "only available caregiver," but the record does not support such a conclusion. *Cf. id.* at *3 ("[The defendant] attempts to

establish that he is the only available caregiver by providing the Court with a list of individuals

that he believes cannot care for [his mother] or whose own life circumstances would make

providing care burdensome. But that is not enough. Unwilling individuals are not unavailable;

and the fact that it would be difficult for other family members does not equate to

unavailability.") While the Court commends Mr. Johnson's desire to care for his ailing mother,

he has not established that this is an extraordinary and compelling reason for his release.


       (c) *§ 1B1.13(b)(5): The Catchall Provision*

Mr. Johnson claims that the sentencing disparity between himself and his codefendants,

as well as other federal defendants convicted of bank robbery, constitutes grounds for

compassionate release. (Def.'s Br., DE 1066 at 17–21.) The Court construes this claim under the

"catchall" provision of § 1B1.13(b)(5) which provides that extraordinary and compelling reasons

exist when "[t]he defendant presents any other circumstance or combination of circumstances

that, when considered by themselves or together with any of the reasons described in paragraphs

(1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." However,

Mr. Johnson has not shown that his sentence is disparate when compared with other sentences.

Mr. Johnson's statutory maximum term of imprisonment was life. (PSR ¶¶ 109, 110). His

total offense level was 45, his criminal history category was V, resulting in a Guidelines range of

life imprisonment. (PSR ¶ 111). The Government filed a substantial assistance motion, and

Judge Lozano sentenced Mr. Johnson to two concurrent sentences of 40 years on each count.

(DE 756.)

On the other hand, Mr. McGregor was sentenced to 240 months of imprisonment. (DE

765.) Yet he did not plead guilty to Counts 3 or 9 as Mr. Johnson but to Count 2, which charged

him with violation of 18 U.S.C. § 2113(d) (aggravating bank robbery), and for which the statutory maximum penalty is 25 years of imprisonment. Like Mr. Johnson, Mr. McGregor received a benefit under § 5K1.1. Mr. McGregor's conduct, even as Mr. Johnson himself described it during the change-of-plea hearing and in his plea agreement, was different from his own. Mr. Johnson directly assisted in causing the death of two innocent people and lifetime impairment of a third person. Unlike three of the other co-defendant's who received lesser sentences, Mr. Johnson entered the bank armed with a handgun while Mr. Corley was in the process of robbing it. After entering the bank and seeing the security guard lying on the floor, Mr. Johnson moved the gun out of reach of the guard and kept watch so Mr. Corley could continue the robbery. (PSR, DE 994 ¶¶ 18–20.) On the other hand, Mr. McGregor never entered the bank and his role was to keep a lookout outside and be the driver of the getaway car. Therefore, it's no surprise that their sentences are different, and it cannot be said that this difference is disparate.

The same is true of his two other codefendants, Ms. Ramsey and Ms. Gay, who received lower sentences than Mr. Johnson. Ms. Ramsey pleaded guilty to an Information in a separate case (Case No. 2:03-cr-87), charging her with § 2113(a) (bank robbery), which provides for a maximum penalty of 20 years. She was sentenced to 85 months of imprisonment (*see* DE 15 in Case No. 2:03-cr-87). In turn, Ms. Gay pleaded guilty to violating 18 U.S.C. § 371 (conspiring to rob a bank), which provides for a maximum penalty of 60 months and was sentenced to 45 months of imprisonment. (DE 777.) As with Mr. McGregor, neither woman entered the bank; in fact, they weren't even close to the bank and their sole role was to switch out the cars and facilitate the escape. In other words, without showing that their conduct was similar to his own,

Mr. Johnson has failed to establish that there's a disparity in his sentence that would qualify as an extraordinary and compelling reason for his release.

Also, insofar as Mr. Johnson insists that his sentence is disparate from the sentences of other offenders in general, he has no evidence to support this contention. While Mr. Johnson argues that the average sentence for someone convicted of murder is 255 months of imprisonment (*see* Def.'s Suppl. Br., DE 1084 at 3), he has not shown that the persons convicted of the same offense under similar circumstances routinely receive sentences substantially lower than his. Without such a showing, he's not entitled to compassionate release.

### (d) *§ 1B1.13(d): Rehabilitation and Individualized Circumstances*

Mr. Johnson argues that his "sterling prison conduct and extraordinary post-sentencing rehabilitation combined with countless reference letters in support of [his] reduction of sentence from Bureau of Prisons staff members rises to the level of extraordinary and compelling under § 1B1.13(b)(5)." (Def.'s Suppl. Br., DE 1084 at 1.) He submitted with his motion six letters from various supervisors who describe him as prepared and organized at his job as a cook, responsible, positive and respectful toward others, and, loyal to superiors. They say that he is one of the most talented cooks at the facility and that he wants to start his own restaurant when released. Reverend Dr. A. Darrell Barlow believes that Mr. Johnson "has been completely rehabilitated and is well positioned to contribute to society for the remainder of his life." (Letter, DE 1066-1 at 29.) One letter says that Mr. Johnson is the one inmate that all the supervisors feel most comfortable with. (Letter, DE 1066-1 at 30.) Finally, a senior officer from Mr. Johnson's unit states that Mr. Johnson displays good character and positivity through the unit. He writes, "I

feel confident in saying Mr. Johnson deserves another chance and that a reduction of his sentence will allow him to begin his new chapter in life." (Letter, DE 1066-1 at 32.)

Indeed, this is high praise for Mr. Johnson from the prison's staff that the Court does not see often, but § 1B1.13(d) specifically provides that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." And although "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted," there are no other circumstances that alone or in combination with each other point to the need for a reduced sentence. In that sense, rehabilitation is all that Mr. Johnson has to support his cause but rehabilitation by itself is not enough to establish extraordinary and compelling reasons for reduction of sentence.

The Court notes that Mr. Johnson's request to release him from imprisonment on the basis of his rehabilitation overlaps with the Court's discussion above under § 1B1.13(b)(5) (the "catchall provision"). For example, Mr. Johnson submits that he "has participated in numerous courses/program classes that the BOP offers" which he successfully completed. (Def.'s Br., DE 1066 at 16.) He "has also accumulated countless hours toward his Apprenticeship in the Culinary Arts." (*Id.*) Mr. Jonson "has also stayed in contact with a very supportive family, in which he has full support in helping [him] transition back into society." (*Id.*) Mr. Johnson also points out that he has taken care of his financial obligations, including paying restitution and ,as of the time of the motion, only a $125 balance remained. (*Id.* at 18.) He further argues that his age and maturity have positioned him to be a contributing member of society, and that because he has been

discipline-free for 21 years and is held at a medium security prison, he is no longer a threat to the public. Finally, he cites a re-entry plan as additionally reflecting his readiness for release.

Indeed, Mr. Duncan is to be commended for his many achievements during his incarceration. However, his rehabilitation and family support in this instance are not "similar in gravity" to those circumstances referenced in §§ 1B1.13(b)(1), (b)(2), (b)(3) and (b)(4). Moreover, here, rehabilitation, even along with his family support, would not constitute an extraordinary and compelling reason for release. *See* 28 U.S.C. § 994(t); § 1B1.13(d); *cf. United States v. Peoples,* 41 F.4th 837 (7th Cir. 2022). As a result, these circumstances do not warrant his early release.

(e) *Mr. Johnson's New Arguments in the Reply Brief*

In his reply brief, Mr. Johnson adds three more grounds that he believes constitute extraordinary and compelling reasons for his release. He claims that Judge Lozano subjected him to double jeopardy by imposing two sentences on Counts 3 and 9 instead of a single sentence. He also appears to claim that his attorney provided ineffective assistance of counsel. Finally, he renews the argument he made in his § 2255 motion concerning the bank robbery not being a crime of violence.

To begin with, arguments raised for the first time in a reply brief are waived unless "exceptional circumstances" justify an exception to waiver. *See United States v. Fluker*, 698 F.3d 988, 1004 (7th Cir. 2012). "The reason for this rule of waiver is that a reply brief containing new theories deprives the respondent of an opportunity to brief those new issues." *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998). Therefore, the Court need not consider Mr. Johnson's new arguments. Even so, they are meritless.

The Court fails to understand the significance of Mr. Johnson's argument that bank robbery is not a crime of violence. First, he's wrong about that. *See United States v. Bevly*, 110 F.4th 1043, 1048 (7th Cir. 2024) ("We have previously held that bank robbery in violation of § 2113(a) is a crime of violence under the career-offender guideline. . . . *Borden* has no effect here."). Second, as the Court explained in its order on Mr. Johnson's § 2255 motion, he was not sentenced under the Armed Career Criminal Act and 18 U.S.C. § 2113(e) does not contain any sort of residual clause that is akin to the Armed Career Criminal Act. Nor was he classified as a career offender under the residual clause of U.S.S.G. § 4B1.1. So, whether the bank robbery is a crime of violence is irrelevant for ruling on his motion for compassionate release.

Next, Mr. Johnson has not shown that his counsel was ineffective either during his change of plea hearing or at sentencing to suggest a gross sentencing disparity between his sentence and the sentence he would receive today. Insofar, as he makes this argument under the umbrella of subsection (b)(6), he has demonstrated no change in law on this issue. The same is true of his claim of double jeopardy. Even if Mr. Johnson should have received only one sentence on Counts 3 and 9, he has not shown that his sentence would be any different now, given that both sentences were the same and ordered to be served concurrently.[5] In short, Mr. Johnson's new arguments do not establish extraordinary and compelling circumstances for his release.

### (3) *Section 3553(a) Factors Weigh against Mr. Johnson's Early Release*

---

[5] Mr. Corley made a similar, although more expansive, argument in his motion under § 2255, but the Court found, among other things, that he failed to identify any "collateral consequences of being convicted of and sentenced on both § 2113(e) counts." *Corley v. United States*, No. 3:02-CR-116 JD, 2023 WL 4102441, at *18 n.9 (N.D. Ind. June 21, 2023). The same is true here.

But even if Mr. Johnson could demonstrate extraordinary and compelling reasons for his release, the Court would still deny his motion based on its consideration of the § 3553(a) factors. Two and a half years have passed since the Court denied Mr. Johnson's original motion for compassionate release on April 11, 2022. In its opinion, the Court explained that, even if there had been an extraordinary and compelling reason to grant the motion, a consideration of relevant § 3553(a) factors kept the Court from finding that Mr. Johnson was entitled to the relief he is seeking. (Op. & Order, DE 1036 at 5–6.) In his second motion, Mr. Johnson has not shown that the facts considered under § 3553(a) have changed. Instead, he largely repeats his arguments from the first motion, which the Court had considered but did not find convincing to grant relief. He argues that he is of advanced age, poses no threat if released, has a re-entry plan, and has a supportive family to assist him upon his release. Mr. Johnson also attached a list of programs he has completed at the BOP. (DE 1066-1.) He also included many letters from his supervisors at his prison job as well as other prison officials, each recognizing his dramatic transformation. These letters describe a much different person than the one who aided and abetted the killing of two persons and permanently injuring a third one during an attempted bank robbery.

The Court commends Mr. Johnson for participating in prison programming and for his efforts to rehabilitate himself. Yet these positive efforts must be considered together with his very serious crimes that have left two people dead and one permanently injured. Having done that, the Court finds that its original consideration of the § 3553(a) factors remains salient and unchanged, so the Court will adopt its findings stated in its April 11, 2022, Opinion and Order:

> In support of his motion, Mr. Johnson asserts that he has received excellent work evaluations, has completed a host of classes and programs, would have a home upon release, and believes he would be able to secure employment. (DE 1020 at 12–13.) Mr. Johnson also maintains that he has strong family ties, as attested to in a variety of letters he submitted as exhibits. (DE 1020-1.) While these represent positive factors that indicate Mr. Johnson may be less likely to recidivate upon

release, there are several other factors that weigh against Mr. Johnson's release. See *United States v. Ugbah*, 4 F.4th 595, 596 (7th Cir. 2021) (finding it sufficient for a court to provide one reason adequate to support the denial of a motion under § 3582(c)(1)(A)).

The nature and circumstances of Mr. Johnson's offense were very serious. Around July of 2002, Mr. Johnson, along with four other co-conspirators, planned to rob the First State Bank of Porter. (Presentence Investigation Report, DE 994 ¶ 12.) The plan called for Johnson, along with two other co-conspirators (Corley and McGregor), to drive to the bank and enter while disguised and armed. (*Id*. ¶ 13.) The other two co-conspirators (Ramsey and Gay) were to wait in other locations and then assist in the getaway. (*Id*.) On August 27, 2002, Johnson, Corley, and McGregor drove to the bank, arriving just before 11:14 a.m. (*Id*. ¶ 17.) Once inside, Corley shot the security guard and two bank tellers using a .45 caliber handgun. (Id. ¶ 18.) Both tellers tragically died as a result. (*Id*. ¶¶ 10, 11.)

Mr. Johnson also has a lengthy criminal history that includes juvenile convictions for burglary and aggravated battery, as well as adult convictions for multiple robberies, burglary, criminal recklessness, battery, receiving stolen property, and illegally carrying a handgun. (*Id*. ¶¶ 66–82.) This lengthy prior criminal history coupled with the conduct underlying the instant offense indicates a high likelihood to recidivate. Further, the Court notes that Mr. Johnson received a forty-year sentence and still has roughly [35%] of this sentence remaining at this time.[6]

Under these circumstances, the Court does not find that the § 3553(a) factors support Mr. Johnson's compassionate release or a reduction in sentence.

(Op. & Order, DE 1036 at 5–6.) The Court adds to these findings that the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct" are at the forefront of the Court's decision.

**(3)  Conclusion**

---

[6] Mr. Johnson was arrested on September 3, 2002, and was detained through his sentencing. Upon sentencing, he was turned over to the custody of the Bureau of Prisons where he remains with a scheduled release date of February 2, 2037.

For these reasons, the Court DENIES Mr. Johnson's motion for compassionate release (DE 1066).


SO ORDERED.

ENTERED: October 15, 2024

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court